**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 01 2014, 10:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JULIANNE L. FOX**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) |
| | ) |
| S.T. (Minor Child), | ) |
| | ) |
| And | ) |
| | ) |
| R.M. (Father), | ) |
| | ) |
| Appellant/Respondent, | ) |
| | ) |
| vs. | ) No. 82A01-1309-JT-396 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES | ) |
| | ) |
| Appellee/Petitioner. | ) |

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
The Honorable Renee Allen Ferguson, Magistrate

**May 1, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

R.M. ("Father") appeals the termination of his parental rights to his daughter, S.T. He challenges authorities' decision not to place S.T. with his family and argues that there is insufficient evidence to support the termination order. But Father's family was not approved to care for S.T., and Father has a significant and violent criminal history that has caused him to be incarcerated for the entirety of his daughter's young life—he has never met S.T. or shown that he is capable of caring for her. We conclude that there was sufficient evidence to support the trial court's decision to terminate the parent-child relationship. We affirm.

**Facts and Procedural History**

S.T. was born on February 27, 2011. Hospital employees notified the local Vanderburgh County Department of Child Services ("VCDCS") that S.T. tested positive for THC at birth. S.T.'s mother ("Mother") entered into an informal adjustment with VCDCS that required her to submit to random drug screens, but when she tested positive for methamphetamine in May 2011, S.T. was removed from her care and temporarily placed in foster care. VCDCS filed a petition alleging that S.T. was a child in need of services ("CHINS"), and Mother ultimately admitted that S.T. was a CHINS.

At the time of S.T.'s birth, Mother was married to D.A. Therefore, S.T. was presumed to be D.A.'s daughter. After being placed in foster care temporarily, S.T. was placed with D.A. D.A. lives with his fiancée E.P. and their respective children, including S.T.'s two half siblings. Mother has since consented to S.T.'s adoption by D.A. and E.P., and she does not participate in this appeal.

In summer 2011—after S.T. was placed with D.A.—VCDCS learned that Father might be S.T.'s biological father. In early 2012 DNA testing confirmed that Father is S.T.'s biological father. But because he was incarcerated, Father was not ordered to participate in any CHINS-related services.

VCDCS filed a petition to terminate Father's parental rights in August 2012. The trial court held three hearings on the petition in 2013 and Father, who was still incarcerated, participated by phone. At the hearings, those involved in the case expressed concern about Father's ability to care for S.T. due to his continued incarceration and criminal history. Father has four misdemeanor convictions and five felony convictions for attempted armed robbery, robbery, battery with a deadly weapon, possession of a controlled substance, and robbery resulting in bodily injury. Father was incarcerated before S.T.'s birth and his earliest release date is June 2015, though he testified that he believed he would be released at the end of 2014. Tr. p. 30, 45. Father's criminal conduct prevented him from having any relationship with his daughter—Father testified that he had never met or spoken to S.T. *Id.* at 44.

Elizabeth Herman, a VCDCS caseworker, testified that Father was not capable of caring for S.T. because of his "history of violence, as well as substance abuse. He's

3

never maintained employment or housing on his own." *Id.* at 75. Herman also testified that Father had only recently started paying three dollars in child support each week. *Id.* Herman recommended terminating Father's parental rights. *Id.* at 80. Another caseworker, Patricia Roedel, also recommended terminating Father's rights, noting Father's violent criminal history and that he would not be released until 2015. *Id.* at 125. Roedel also explained that S.T. was bonded to her foster family, including her half-siblings, and was living in a safe and stable home. *Id.* at 126.

The court-appointed special advocate ("CASA") assigned to the case, Debra Gamache, testified that Father posed a threat to S.T. CASA Gamache explained that Father's criminal history included acts of violence and that he had been violent toward Mother in the past.[1] *Id.* at 194. She also testified that S.T. needed permanency and stability and that her foster family could offer her those things. *Id.* CASA Gamache recommended terminating Father's parental rights, saying:

> [S.T.] has been placed with [her stepfather D.A.] and her half-siblings. That's [the] only really [sic] father, and [E.P.'s] the only real mother that she's ever known. [She's] very bonded to the family and her siblings. She's always right there with them. . . . [S.T.] needs stability. She needs to remain with her siblings. And I believe [VCDCS] has an appropriate plan for that to happen.

*Id.* CASA Gamache said that D.A. and E.P. planned to adopt S.T. and expressed her belief that removing S.T. from her current placement would be very detrimental to her. *Id.* at 197-98.

Caseworkers explained that Father's family—specifically his mother and sister—had not been considered for placement initially because paternity had not been

---

[1] There was no objection to this testimony.

4

established and therefore they had no legal relationship to S.T. After paternity was established, they were not approved for placement because Father's mother had not been compliant with VCDCS and she and Father's sister were not employed. *Id.* at 82. Caseworkers had "[w]eighed the pros and cons" and decided not to change S.T.'s placement because S.T.'s foster family was capable of providing for her and S.T. was bonded to the family, which included her half-siblings. *Id.*

Father asked the court not to terminate his parental rights. He testified that he paid "$70 [or] $75," in child support since paternity had been established. *Id.* at 347. When asked about his plans when released from prison, Father said he would be on parole and would live with his mother. *Id.* at 355. Father had not secured a job, but he planned to work in construction with a certificate he obtained while incarcerated. *Id.* at 356.

In September 2013 the trial court entered its order with findings terminating Father's parental rights. Appellant's App. p. 26-32.

Father now appeals.

**Discussion and Decision**

On appeal, Father challenges VCDCS's refusal to place S.T. with his mother and sister and argues that there is insufficient evidence to support the termination order.[2]

---

[2] In a single paragraph, Father also asserts that his due-process rights were violated by alleged procedural irregularities in the underlying CHINS and termination proceedings. *See* Appellant's Br. p. 15. But Father did not raise any CHINS-related challenges during the termination proceedings, and a party may not raise an issue for the first time on appeal. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). Father also offers no legal authority to support this due-process claim, and therefore he has waived it. *See* Ind. Appellate Rule 46(A)(8)(a) ("[e]ach contention must be supported by citations to the authorities, statutes, and the appendix or parts of the Record on Appeal relied on, in accordance with Rule 22."); *see also In re J.V.*, 875 N.E.2d 395, 402 (Ind. Ct. App. 2007) (party waives any issue raised on appeal where the party fails to develop a cogent argument or provide adequate citation to authority), *trans. denied.*

## I. S.T.'s Placement

Father first challenges VCDCS's refusal to place S.T. with his mother and sister, S.T.'s paternal grandmother and aunt.

Father repeatedly states that his mother and sister were "appropriate parties for third[-]party custody."[3] But caseworkers said otherwise: at the termination hearing, they testified that Father's mother and sister were not considered for placement initially because paternity had not been established and they had no legal relationship to S.T. After paternity was established, they were not approved for placement because Father's mother had not complied with VCDCS and she and Father's sister were not employed. By contrast, S.T.'s foster family was capable of providing for her and S.T. was bonded to the family, which included her half-siblings.

Father does not dispute the caseworkers' testimony; instead, he argues that S.T. should have been placed with his family because they are her biological relatives. But because the evidence shows that Father's family was not approved for placement, we find no error here.

## II. Termination of Parental Rights

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests

---

[3] Father also claims that he gave custody of S.T. to his mother and sister. *See* Appellant's Br. p. 13 ("[Father] also gave his mother and sister custody on December 12, 2012."). But because Father has never had custody of S.T., he could not have given custody of S.T. to anyone else.

recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted).  Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted).  Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted).  Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted).  "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)).  In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

> (i)  The child has been removed from the parent for at least six (6) months under a dispositional decree.

7

(ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, Father appears to challenge the sufficiency of the evidence supporting the trial court's judgment as to subsections (B) and (C) of the termination statute.

## A. Conditions Remedied

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, VCDCS was required to establish, by clear and convincing evidence, only one of the

three requirements of subsection (B). Because we find it to be dispositive, we address only the arguments regarding subsection (B)(i); that is, whether there was a reasonable probability that the conditions resulting in S.T.'s removal or the reasons for her placement outside Father's home would be remedied.

In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, ___ (Ind. 2014) (citation omitted). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* (quotation omitted). The second step requires trial courts to judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* (citations omitted). In so doing, trial courts may find "that parents' past behavior is the best predictor of their future behavior." *Id.*

Here, the trial court concluded that there was a reasonable probability that the conditions resulting in S.T.'s removal from Father's care or placement outside his home would not be remedied. Appellant's App. p. 28-29. The court expressed concern about Father's criminal history, including his four misdemeanor convictions and five felony convictions for attempted armed robbery, robbery, battery with a deadly weapon, possession of a controlled substance, and robbery resulting in bodily injury. The court explained that:

> Father's history with the criminal-justice system, incarceration during the [CHINS proceeding] and likelihood of years of more incarceration indicate that he is unlikely to remedy the reasons for continued placement of [S.T.] outside his care. Father's current incarceration is a condition that is unlikely to be remedied before 2015. Given Father's criminal history and history of incarceration, his inability to be available for and supervise [S.T.] is not likely to be remedied.

*Id.* at 28-29 (formatting altered).

We cannot conclude that it was clearly erroneous for the trial court to find that Father's significant and violent criminal history—which caused him to be incarcerated for the entirety of S.T.'s young life and prevented him from ever meeting his daughter— was the best predictor of Father's future behavior and his inability to provide for S.T. *See E.M.*, 4 N.E.3d at ___; *see also In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (courts may consider a parent's criminal history when determining whether the conditions that resulted in a child's removal will not be remedied). Father's arguments that he has learned a trade while incarcerated and has paid some child support are invitations to reweigh the evidence, which we may not do.

The evidence supports the conclusion that there was a reasonable probability that the conditions resulting in S.T.'s removal or the reasons for her placement outside Father's home would not be remedied.

### B. S.T.'s Best Interests

Father also contends that termination of his parental rights is not in S.T.'s best interests.

In determining what is in a child's best interests, the trial court must look to the totality of the evidence. *See E.M.*, 4 N.E.3d at ___ (citation omitted). "In so doing, the

trial court must subordinate the interests of the parent to those of the child." *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Moreover, we have previously held that the recommendations of both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that terminating is in the child's best interests." *Id.* (citation omitted).

The caseworkers assigned to this case recommended terminating Father's rights, explaining that Father's criminal history and continued incarceration made him incapable of providing a safe and stable home for S.T. They also testified that S.T. is bonded to her foster family and is well cared for by them. Referencing this testimony, the trial court found that "there is no guarantee that [Father] . . . will [] be able to bond with [S.T.], seek legal custody of [S.T.], parent [S.T.] appropriately, and obey the law following release from his current incarceration." Appellant's App. p. 30. The trial court also found that termination, followed by adoption, was in S.T.'s best interests because she "is in immediate need of permanency and should not be required to wait for Father to be released from prison to have such permanency established. It is not in the best interest[s] of [S.T.] to be raised by the State of Indiana during the remainder of Father's incarceration." *Id.* Father fails to refute these findings; rather, he again argues that his mother and sister should "have third party custody without termination of Father's rights." Appellant's Br. p. 16. We are not persuaded.

11

We conclude that the evidence supports the trial court's determination that termination of Father's parental rights is in S.T.'s best interests.  *See E.M.*, 4 N.E.3d at ___; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them).

Affirmed.

NAJAM. J., and BROWN, J., concur.